**Hockley v. Hockley-Arhondakis**

C.P. of Cumberland County, no. 98-2260 Civil Term.

*Diane G. Radcliff,* for plaintiff.
*Samuel W. Milkes,* for defendant.
*P. Richard Wagner,* for child.

OLER, *J.,* March 28, 2000—This case presents the question of whether a custody order which affords a non-custodial parent minimal periods of partial custody can be enforced where the custodial parent and teenage child refuse to cooperate with the order. The immediate issue for resolution is the sanction to be imposed upon the custodial parent for contempt of the custody order.

## PROCEDURAL HISTORY;
## STATEMENT OF PERTINENT FACTS

The plaintiff is Garry Lynn Hockley, an adult individual residing at 432 Hidden Valley Road, New Cumberland, Cumberland County, Pennsylvania.[1] The defendant is Sherri Hockley-Arhondakis, an adult individual residing at 915 Magnolia Drive, Enola, Cumberland County, Pennsylvania.[2] The parties are the parents of Garry Lynn Hockley Jr., who was born on June 7, 1986, and is presently 13 years old.[3]

Pursuant to a November 27, 1995 Adams County order of court, entered by agreement of the parties at a time when Father was stationed with the army in Kentucky, Mother was granted primary legal and physical custody of the child and Father was granted partial custody rights.[4] On April 28, 1998, Father filed the present Cumberland County action to expand his custodial rights. The effect of this filing was described, credibly in the court's view, by Father as follows:

"Q. Mr. Hockley, you heard Sherri testify about your visitation. Can you tell me when it ended?

"A. May 3, 1998.

"Q. And was that concurrently with you filing for custody?

"A. Yes.

"Q. And to your knowledge, why was your visitation stopped?

1. N.T. 4, hearing, March 2, 2000.
2. N.T. 75-76, hearing, January 31, 2000.
3. N.T. 99, hearing, January 31, 2000.
4. Plaintiff's exhibit 1, hearing, August 20, 1999.

"A. May 4, I received a phone call from Sherri, telling me that, you're not going to take my son away from me.[5] . . .

"Q. What was your understanding as to why your visitation stopped? You said you got a phone call?

"A. I received a phone call from Sherri in reference, I'm not going to take my son away from her. Just went on and on. I had no intentions of taking [him] from her. I just wanted a stable visitation. That's why I filed a visitation order (sic)."[6]

As of the present time, Father has not seen the child for almost two years.[7]

A custody hearing was held by this court on August 20, 1999. At the hearing, two of the circumstances which impressed themselves most forcibly upon the court were the extremely close bond between Mother and the parties' child, and Mother's intense hatred for Father. Following the hearing, the court entered the following order, which was not appealed, affording Father minimal partial custody rights:

"And now, August 23, 1999, upon consideration of plaintiff's custody modification complaint with respect to the parties' child, Garry L. Hockley Jr. (d.o.b. June 7, 1986), and following a hearing held on August 20, 1999, it is ordered and directed as follows:

"(1) Legal custody of the parties' child shall be shared by the parties.

---

5. N.T. 59, hearing, March 2, 2000.

6. N.T. 60, hearing, March 2, 2000.

7. N.T. 54, hearing, March 2, 2000. At one point during this period, Father agreed to forgo visitation or partial custody because of the child's estrangement from him. See order of court, September 30, 1999.

"(2) Primary physical custody of the child shall be in Mother. Temporary or partial physical custody of the child shall be in Father at the following times:

"(a) During the next month, at two sessions with Dr. A. Jose Delerme [the child's psychologist], the expense of which shall be borne by Father;

"(b) During the succeeding two months, on alternating Saturdays from 10 a.m. until 7 p.m.;

"(c) During the following four months, on alternating weekends from Saturday at 10 a.m. until Sunday at 7 p.m.

(3) At the conclusion of the seven-month period provided for in paragraph 2 of this order, either party may petition for a modification of this order based on circumstances then existing.

"(4) Neither party shall inflict corporal punishment upon the child.

*"(5) Neither party shall make his or her home available to the child during the other's periods of custody or otherwise accommodate a lack of adherence to the terms of this order.*

*"(6) Transportation for purposes of exchanges of custody shall be the responsibility of the party who is yielding custody to the other, unless otherwise mutually agreed."* [8]

After receiving this order, Mother told the child that "the court case that we had did not go in his favor, our favor." [9] Not surprisingly, upon receipt of this construction of the order, the child threw a tantrum. [10]

8. Order of court, August 23, 1999. (emphasis added)

9. N.T. 78, hearing, January 31, 2000.

10. N.T. 78, hearing, January 31, 2000.

The order of August 23, 1999 has never been complied with by Mother or child. Although Mother responded, "Very much so," when asked whether she felt she had control over the child,[11] her position was that she was helpless to comply with the order in the face of her son's opposition to its terms.[12] However, the child described an effort on her part as follows:

"Q. Now, what has your mom told you about going to visit with your dad?

"A. Every time that it was scheduled, she would ask me, do you want to go see him? I would say no. She said, the judge said you have to go. I would keep saying, no, I don't want to go. Then she said, fine.

"Q. So, did she tell you that you had to go?

"A. She said—what she said was that I was supposed to go see him, and she would ask me every time I was supposed to go see him, do you want to go see your dad, and I said no.

"Q. Then she said fine?

"A. She would say, well, I can't make you." [13]

On the subject of his perception of his mother's sincerity in encouraging his compliance with the directed contact with his father, the child testified as follows:

"Q. Did she ever encourage you to go, tell you that she wanted you to go?

"A. Yes.

"Q. Did you believe her?

"A. No." [14]

---

11. N.T. 84, hearing, January 31, 2000.
12. N.T. 83-84, hearing, January 31, 2000.
13. N.T. 111-12, hearing, January 31, 2000.
14. N.T. 112, hearing, January 31, 2000.

The court's perception of the message being conveyed by Mother to the parties' child is the same as the child's. Mother was found in contempt of the custody order of August 23, 1999, following a hearing.[15] At the conclusion of the hearing, the court encouraged the parties to comply with the custody order.[16]

A hearing on the issue of sanctions for the contempt was held on March 2, 2000. At the hearing, it was evident that the order remained uncomplied with.[17] Evidence presented by Father established that he had incurred attorney's fees in the amount of $3,165 in connection with the contempt proceedings.[18]

At the conclusion of the hearing, the court took the matter of sanctions under advisement, making these observations prior to adjournment:

"This is a very difficult case, obviously.[19] When a family has disintegrated to the extent that this family has, the responsibilities of the members with respect to custody and support cannot be resolved by common understanding, and the rights of the members cannot be protected by leaving them to other members to determine.

"And as I tried to say at the last hearing, that is why we have courts, and that is why court orders have to be obeyed. If a decision of a court is felt to be wrong and not supported by the evidence, the remedy is through

---

15. Order of court, February 2, 2000.

16. N.T. 131, hearing, January 31, 2000.

17. N.T. 5-6, hearing, January 31, 2000.

18. Plaintiff's exhibit 1, hearing, March 2, 2000.

19. Although a difficult case, the court was reluctant to agree with defendant's (former) counsel that the difficulty was comparable to that faced by the federal judge who ordered John L. Lewis and the United Mine Workers back to work. N.T. 126, hearing, January 31, 2000.

the appeal process and not through disobedience of the order. The appellate courts, as the attorneys know in this case, have very broad powers with respect to appeals from custody orders.

"This is not an involuntary termination of parental rights case. It is a custody case. And both parents have some right to custody or visitation. Again, as I tried to explain at the last hearing, the order that I entered on August 23 of last year provided the most minimal custodial rights on the part of the defendant, and initially called for mere participation in joint counseling sessions.

"That order was not appealed. Instead, it was simply not obeyed. As far as I'm aware, and I think the testimony today has borne it out, the father has not been able to have any contact with the child since the order was entered. And this denial of contact started after he filed a petition for expanded custody rights.

"It seems to be that the mother in this case, as the custodial parent, has a duty to do more than merely acquiesce in the child's preference with respect to the custody order. I did take into account the child's preference in entering the very limited order with respect to partial custody on the part of the father that I did.

"I do not think that the mother has acted totally in good faith in this proceeding, although I understand it is a difficult situation for all parties. . . ."[20]

"As I said at the last hearing, I'm awfully sorry that the parties are unable to get along. I think a good deal of hate has injected itself into the proceeding, and I think that has affected the child adversely. . . ."[21]

20. N.T. 65-66, hearing, March 2, 2000.
21. N.T. 67, hearing, March 2, 2000.

## DISCUSSION

A custodial parent has an obligation to obey the terms of a child custody order as they pertain to the noncustodial parent's rights and to cooperate in its effectuation. See *English v. English,* 322 Pa. Super. 234, 469 A.2d 270 (1983); see also, *Guadagnino v. Montie,* 435 Pa. Super. 603, 646 A.2d 1257 (1994) (term requiring custodial parent to deliver child). The fact that the custodial parent does not believe that the order is in the child's best psychological interest does not justify its violation. *English v. English,* 322 Pa. Super. 234, 241-42, 469 A.2d 270, 273 (1983).

Enforcement of custody orders through the contempt process is provided for in the Pennsylvania Rules of Civil Procedure. See Pa.R.C.P. 1915.12. It is the commonly used process for securing compliance by a parent who fails to adhere to an order. See *e.g., Lambert v. Lambert,* 409 Pa. Super. 552, 598 A.2d 561 (1991).

Sanctions for contempt of a custody order may rise to the level of imprisonment, subject to a condition of purge. Pa.R.C.P. 1915.12; see *Shaw v. Shaw,* 719 A.2d 359 (Pa. Super. 1998). In general, sanctions for civil contempt include reimbursement of the other party for attorney's fees and payment of a monetary amount to the court. See *e.g., Commonwealth ex rel. Novack v. Novack,* 310 Pa. Super. 112, 456 A.2d 208 (1983).

In the present case, the defendant has been, in the court's view, clearly and persistently in violation of paragraphs two (rights of noncustodial parent to partial custody), five (responsibility not to accommodate child's recalcitrance), and six (responsibility to transport child

to exchange) of the custody order of August 23, 1999. For this reason, she was adjudicated in contempt on February 2, 2000.

At the hearing on the issue of sanctions held on March 2, 2000, it was apparent that defendant has remained noncompliant with the order. The following order of court will therefore be entered, without prejudice to the plaintiff's right to initiate a new contempt proceeding, seeking more coercive sanctions, in the event that the order continues to be disobeyed.

### ORDER

And now, March 28, 2000, upon consideration of the plaintiff's petition for contempt in the above-captioned matter, following a hearing on January 31, 2000 which resulted in an adjudication of contempt, and a hearing on March 2, 2000 on the issue of sanctions, and for the reasons stated in the accompanying opinion, defendant is directed to reimburse the plaintiff for attorney's fees in the amount of $3,165 and to pay the sum of $500 to the prothonotary, within 30 days of the date of this order.